May it please the Court, my name is Michael Staheling, I represent AT Publishing and this appeal. I'd like to reserve three minutes of my time for rebuttal. Seated with me at council table is Mr. Frank Martone. Mr. Martone is the 88-year-old founder and president of AT Publishing. Together with his wife and more than half a dozen children, children-in-law, and grandchildren, Mr. Martone continues to run the day-to-day operations of AT Publishing. Shortly after the turn of the century, AT Publishing was looking for a new color press. One of the manufacturers that it had worked with before, A.B. Dick, sold AT Publishing a press called the Indigo Press. A.B. Dick arranged for financing of that press through A.B. Dick's financing arm. The Indigo Press printed quality pictures and adequate pictures, but it did not operate at an economical rate. Mr. Martone pointed out to the A.B. Dick salesperson that the press was costing four times more than what had been represented in the literature. A.B. Dick agreed to repurchase that press and upsold AT Publishing on a new press of $49.95, which is the subject of this litigation. Financing for the $49.95 was again arranged through A.B. Dick. A.B. Dick took back the Indigo Press and represented that financing of the new press with payoff financing for the Indigo Press, and also negotiated the terms of the lease for the new press. The $49.95 was new technology. It was actually manufactured by a company in Japan called Ryobi and then modified and resold by A.B. Dick under the A.B. Dick name. This was, however, one of the first presses ever sold or installed by A.B. Dick. Accordingly, the installers did not know how to operate. Similarly, the A.B. Dick trainers who came later to supposedly demonstrate the press had never trained prior to this incidence on the $49.95, and thus they had a difficult time getting the press to properly operate. This was noted as late as April 21, 2003, when the A.B. Dick trainer wrote an internal memo to his superior stating that he was still having trouble getting the press to operate and he was not certain if it was the press or the plate maker that was causing the problem, that they were having problems with getting the images to properly register, which created a blurred image. You explained this very clearly in your briefs, which leads me to the question. Wasn't A.B. Dick the party with the obligation to provide the conforming equipment, not OFC Capital? Certainly, Your Honor, A.B. Dick was the equipment supplier, but under Section 508 of the Uniform Commercial Code, as adopted in Georgia under 11-28508, it states that if the lessor fails to deliver conforming equipment, that the lessor is in breach of the lease agreement, and that the lessee has certain rights, including rescission of the lease contract and certain rights to damages such as the cost of cover. So, no, it's inaccurate to say that the lessor did not have a duty to deliver conforming equipment. While it relied upon A.B. Dick to actually deliver that equipment, it is, in fact, the company that is leasing that equipment to A.T. Publishing. It purchases that equipment from A.B. Dick and then it leases that equipment to A.T. Publishing. As a result of that three-party transaction, there are certain protections that are granted to both the lessor and to the lessee. The protection that's granted to the lessor, Your Honor, is contained in Section 407 of the Uniform Commercial Code, which is traditionally referred to as the Heller High Water Clause. Under the Heller High Water Clause, once the lessee has accepted the equipment, and once the time or circumstances for revocation of acceptance have passed, then the lessee becomes irrevocably bound to the lessor. However, because this is not a traditional bank loan financial transaction where the bank would loan the money to A.T. Publishing and A.T. Publishing would have control of that, the Uniform Commercial Code also grants certain protections to the lessee. Those protections are contained in Sections 509, 517 of the Uniform Commercial Code, and 515 of the Uniform Commercial Code. Essentially, because the lessor could release the money to the vendor and purchase this equipment long before it's even delivered, as they did in this case, Your Honor, the code grants certain protections to the lessee and says that the lessee has no obligation to the lessor even if the lessor has released the money to the vendor and purchased the equipment until after it has accepted the equipment. Under Section 515 of the code, there cannot be an acceptance until the lessee has had a reasonable opportunity to inspect that equipment to verify that it will perform as intended. And this is a critical point. So what does all this mean in terms of the issues you've raised on this appeal? Well, there are several issues, Your Honor. First of all, we believe that the court committed a reversible error by refusing to grant a directed verdict to AP Publishing on the admitted facts in the record. Essentially, OFC, the lessor in this case, presented three items of evidence which it argued constituted acceptance. Before you get to that, what about the point that you weigh, memory? Your Honor, Rule 50 of the Civil Rules of Procedure was amended in 2007, I believe, and the amendments and the commentary there to make clear that if you move for a directed verdict during trial, that argument is not waived because it is not necessarily re-raised after trial. But Rule 50 doesn't cover post-verdict motions. And how exactly does the amendment to Rule 50 overrule Unitherm and NITCO on the subject of post-verdict motions? Well, Your Honor, while there was not a post-verdict motion in this case, clearly the amendments to Rule 50 make clear that if you raise this issue during trial, that it is preserved on appeal even if it is not brought in post-trial. What amendment are you referring to? I mean, it's not there in so many words, is it? Well, certainly the comments there, too, Your Honor, are cited in our brief. There is another important aspect of having to do with this issue of acceptance and the reasonable opportunity to inspect, and that's in addition to the court's error of refusing to grant a directed verdict, the court committed reversible error by failing to properly instruct the jury on what constitutes a reasonable opportunity to inspect. Under the law, a lessee has a reasonable opportunity to inspect equipment to make sure that it conforms or performs as intended or represented. This right cannot be abrogated by contract. Yet in this case, AP Publishing attempted to do just that. It attempted to impose a strict 10-day limit on the right to inspect, and its contract provided that AP Publishing would be erratically bound if it did not reject within that 10-day period. This attempt to limit the reasonable opportunity to inspect to some arbitrary period of time is contrary to the law, and yet when the judge instructed the jury on what it means to have a reasonable opportunity to inspect, the judge made the same error by taking that language, paragraph 5 of the lease, and telling the jury that it must consider that paragraph, that 10-day limit, in determining what is or is not a reasonable opportunity to inspect. Well, the jury heard evidence from OFC that AT had a reasonable opportunity to inspect the equipment fully because verbal verification was not undertaken until after at least 14 days of training and use. And this verbal verification was treated as the final element in AT's acceptance. Following the executed delivery and acceptance receipts and execution of the installation and warranty certificates. The question whether these tests provided AT a reasonable opportunity to inspect the goods seems to me was a question of fact properly submitted to the jury. Your Honor, it was a question of fact properly submitted to the jury under proper instructions for the jury. In this case, we do not know on what basis the jury found that AT Publishing had accepted the equipment. Because the instruction that the judge gave incorporated paragraph 5 of the lease, which stated that the equipment was erratically accepted if not rejected within 10 days, we do not know whether or not the jury based its finding on that paragraph or whether in fact they based it upon evidence at trial about a conversation that occurred not within that 10 days, but some 14 days after the delivery of the equipment. We just don't know that and we don't know that because the court erroneously instructed the jury on what it means to have a reasonable opportunity to inspect. Thank you. Can I come back to the Rule 50? I'm troubled because basically we do have case law in NITCO and we have the Supreme Court saying you do need to make the motion post-verdict. And my understanding of the reason for that was to give the trial judge an opportunity post-verdict because they often let things go to the jury and then say, well, if the jury doesn't take care of this, I'll take another look at it post-trial. What I understood Rule 50 to be focused amendments to Rule 50 was to get rid of the trap for the unwary, which is that if you don't file it and it's not at the close of the evidence technically, then you have waived it even post-trial. You have to make it pre-submission to the jury. And if you don't do that at the close of evidence, that's what the commentary says. That's the language that was removed from the Rule 50 amendment. So it got rid of that problem. But I don't see where the Rule 50 amendments eliminate the requirement that the trial judge, the district judge, be given the opportunity to, through a post-verdict motion, to reconsider in light of the jury verdict whether you're entitled to a JMOL at that point. Because then what you're saying is you make the motion before verdict, you don't make it post-verdict, so you're eliminating the district court as a participant in reconsidering, and we're supposed to then look at the evidence, sufficiency of the evidence. And the district courts never have been given that opportunity. So why should we, as this panel, use your view of Rule 50 to overrule NITCO? Well, I understand, Your Honor, that there is an unanswered question in the law regarding the scope of the amendments to Rule 50 since the cases that you're referring to pre-date the amendments to Rule 50. Well, NITCO post-dated, but unfortunately didn't cite Rule 50. So there is a question of law, and I understand that this court could interpret Rule 50 to either preserve an argument on appeal that was raised during trial, or could rule that, in fact, Rule 50 did not change in the prior cases, and that failure to file a post-trial motion means that those arguments are weighed. But even if this court were to reach that goal, the only argument that that would address would be our argument that this court should grant a directive for a case of... Yes, no, I understand, but that's why I was coming back to it, though, because at least on, you know, you... You appreciate the magnitude of what a decision would be for us to go with your reading of Rule 50. Certainly, Your Honor, but I think you can also appreciate that the amendments to Rule 50 certainly created an ambiguity in this case. Well, that may be, but the question is whether we can... that they create enough for us to overrule NITCO, but I understand your position. So there is no prejudice that we're going to see capital to having this court review the facts under the directed motion or directed verdict standard. While there may be some prejudice to the district court and that the district court was not granted an opportunity, there is no prejudice to OFC capital. No, no, it's more... well, yeah, I'm not trying to preserve the district court to preserve its fairness. I'm trying to preserve the useful function that appellate judges like to have with the district court who heard all the evidence, get a chance to rule on it. That's what we're trying to preserve. I understand, Your Honor. Let me briefly address two other points, and that's that the district court committed reversible error by failing to instruct the jury on revocation of acceptance. Under Section 517 of the Code, a lessee is entitled to revoke acceptance... let me get the language here... to revoke acceptance of nonconforming goods if the nonconformance was unknown at the time of acceptance and acceptance was reasonably induced by the lessor's assurances. Again, this is a right that cannot be abrogated by contract. The district court committed error by failing to instruct the jury on revocation of acceptance, and its error was premised on a fundamental misunderstanding of the UCC and lease finance transactions in general. The district court erroneously concluded that a lessor has no duty to tender conforming goods under the lease contract. Specifically, the court stated, I have decided not to give the instruction on revocation. In a nutshell, my reason is that there is no evidence of breach of the finance lease which is necessary to support a revocation theory. I say this because it is my interpretation that as a matter of law, consistent with the terms of the master lease agreement, the finance lessor had no obligation to provide goods that were suitable for the lessee's intended use. In other words, the court concluded that the lessor had no duty to deliver conforming goods and that failure to deliver conforming goods was not a breach of the lease agreement. This is a fundamental misunderstanding of lease finance transactions and the protections afforded under the UCC. Tendering conforming goods is the very essence of the lease contract. The lessor agrees to lease certain conforming goods, and the lessee agrees to lease those conforming goods from the lessor. Thus, under Section 508 of the Code, it expressly states that if the lessor fails to deliver conforming goods, the lessor is in breach of the lease contract. And so the district court erred in holding that there was no duty to tender conforming goods, the district court erred in holding that the failure to tender conforming goods was not a breach of the lease contract, and as a result, the district court erred in failing to instruct the jury on revocation of acceptance. If you please, the court. I'm Marian Walker from Birmingham, Alabama, representing LFC Capital. We would first address this issue about Rule 50. So LFC's position that AT Publishing has misunderstood the amendment which applied to Rule 50A, and they only cite to commentary secondary sources in advocating their position they maintain even today. But the amendment allows, and forgive me, I've got a poop operation in my throat, allows a renewal of the Rule 50A motion at the close of all the evidence that was made at the close of plaintiff's case without there having to be a stated reason for each and every ground at the close of evidence, so long as those grounds were initially stated at the close of plaintiff's evidence. It does not address nor attempt in any way to abrogate or even change the holding in NITCA, which is upheld in uniform. And by the way, AT Publishing failed to even address that at brief as to how NITCO properly fits in with their argument and avoids the waiver that very plainly is called for by NITCO holding's application to the uniform principle that the trial judge who heard the witnesses, who heard the evidence, gets the first crack at whether or not substantial evidence existed to go to the jury. Additionally, even if there were no waiver, AT Publishing failed to show how there was not sufficient evidence at any term. This condition precedent not having been met, OFC Capital's position is that any and all claims that judgment is a matter of law should have been granted on acceptance, and they even include reasonable opportunity to inspect, which of course is part of acceptance, and revocation. Those three areas, they claim judgment as a matter of law should not be granted. OFC Capital maintains those claims are waived by the holding in NITCO, which incidentally was issued the same week this trial was taking place last year. That point was not addressed either with AT Publishing, but it's handily taken care of by the holding in NITCO, which in that case itself applied a gradual act of law. Secondly, AT Publishing cites two instructions to the jury being incorrect. And once again, there's a dispute as to what standard is to be employed. OFC Capital maintains, and we apologize, we think we could have done better in retrospect, on discussing the standards, but the standard of review is one of abuse of discretion as to the jury instructions given. And an overall view from Gambino as to whether or not the instructions were fairly adequate, fair and adequate to advise the jury as to the law to be applied to the facts of the case. The way AT Publishing would view this matter is to simply ignore that they had a binding mass release with very clear terms that spelled out a number of things. One, it's non-cancellable. They cannot cancel. That is the nature of a finance lease. And they have chosen throughout this case to simply ignore it, requiring OFC Capital to maintain a number of claims for issues that don't apply in finance leases. And when it got to the instruction on acceptance, the court did give the very UCC 2A, Title 2A instruction that AT Publishing saw. He gave the entire instruction on acceptance, but also pointed out the jury should look at Paragraph 5 of the mass release entitled Delivery and Acceptance. AT Publishing's argument that that misstates the law is incorrect, because what they're focusing on is that that paragraph talks about, and he fails to mention, the lessee's obligation to promptly inspect the equipment. But Instruction 11 describes and defines the reasonable opportunity to inspect that the jury is to read into and along with Paragraph 5 of the mass release. And that is this, that it depends on the nature of the circumstances. It depends on the nature of the equipment. The trial court properly submitted this question to the jury. It's a question of fact. Based on the facts that were presented at trial, was there a reasonable opportunity to inspect the jury found there was? AT Publishing's claim is nothing more than a collateral attack on a jury verdict. You know, there's something about this lease that bothered me. If the lease conclusively presumed acceptance ten days after substantially all the equipment was delivered, how does that allow for a reasonable opportunity to inspect the equipment? Well, for one, the facts didn't apply. The lease wasn't applied so that we have a case where that presumption was maintained. There were 14 days from the time of delivery and installation before the final question of whether or not AT Publishing was ready for the lease to begin took place. 14 days. And then, in all, there was never this presumption that was made part of the facts. As a matter of fact, undisputed testimony was that if Mr. Martone had said, no, the equipment doesn't work, we need more time, then OFC would have said, you may have more time. This provision in this contract often applies to many different types of equipment. And so that a lessee can't take an internal period of time to respond and represent whether or not there's an acceptance or not, there is this limitation which clearly is subject to case law. As the judge properly did, he provided that to the jury to interpret along with the lease. Essentially saying, despite that ten-day period, a reasonable time is imposed by law. And that is question of fact. And that's what the jury found. And it's a matter of practice. OFC's undisputed testimony was that the lessee is never required to accept or reject in that final verification if they have not, if the delivery, for instance, has not been made, like in the Kona Enterprises case, or if they have not had a chance to look at the equipment because, for some reason, it doesn't work. That was never said to OFC. They were never told. And let me address this. The law simply does not provide that a finance lessor, by law, is required to deliver or tender goods. By its very nature, a finance lessor does not tender goods and has no obligation. Under the master lease itself, A.T. Publishing agreed with OFC Capital that there was no tendering of goods, but that A.T. Publishing specifically had all warranties and all representations from A.B. Dick and was looking to A.B. Dick to supply the goods. And as a matter of fact, in the testimony in trial, Mr. Martone agreed. We looked to A.B. Dick for the warranties and representations. OFC Capital just provided the money. And so, for their brief to argue otherwise, we believe is disingenuous, has pressed OFC Capital to, again, argue its case, which has been fairly tried by jury. And this concept of revocation as an alternative theory in the First Amendment complaint of A.T. Publishing is one thing, to pursue alternative theories before you get to trial. But A.T. Publishing never made a selection of which alternative theory, but insisted there was no acceptance at all throughout trial, insisted then, oh, but there was revocation, which, of course, requires acceptance. So, OFC was put to trying to defend contradictory defenses, trying to overcome. We believe we did. By showing there's acceptance, we showed that there was acceptance of the lease schedules. And A.T. Publishing, at that point, became obligated to pay. And not before. And regardless of the other arguments of A.T. Publishing, they're unable to establish how it is, that when there is acceptance, they can still avoid liability. They didn't prove it to the jury. They haven't proved it anyway. In fact, all of their claims here on this appeal, if you please the court, do not specifically show us an argument that we can counter as to why anything was incorrect. And we contend Judge Sedgwick ran a great trial, that it was fair, and that we won fair and square. And lastly, on the attorney fees issue, we would submit that A.T. Publishing waived a right to change the way attorney fees were going to be handled. And to now, at this late date, try to claim that there was a substantive concept to these fees is beyond the pale. Because they obviously had a right to deal with our issue on attorney fees any way they saw fit. If they had not stipulated as to how it was going to be handled post-judgment, we would have presented testimony. They may not have wanted to hear me testify to all the hours we had to spend disputing these baseless claims. And we assume that they had that in mind in making that stipulation. And then again, at trial, to agree that that was the way it was to be. Otherwise, the judge could have impaneled the jury to then hear the issue of attorney fees. But A.T. Publishing confirmed its initial pretrial procedure for the fees. And lastly, let me make a point. This claim about the Georgia statute, we do not approve it. This Georgia statute has to do with the concept of after maturity. And dealing with that situation to prevent a penalty where someone's note has matured and a predator simply files suit claiming attorney fees before giving notice that they intend to seek it. That is not the case here at all. And A.T. Publishing failed to show that. But we will present one more thing in their reply brief, which we had not had a chance to. A.T. Publishing claimed there was no dispute that there was an acceleration of the lease by OFC Capital in May of 2003. That is simply incorrect. And we would like leave of court to provide the letters of acceleration that are dated March of 2004, three months after OFC Capital was served with the lawsuit in December of 2003. If it pleases the court, we ask the court to affirm both appeals, the jury verdict that was entered by the court as well as the ordering judgment on attorney fees and allow OFC Capital leave to file a petition for fees, costs, and expenses. Thank you. Thank you. If it pleases the court, I would like to first address the attorney's fees issue. Briefly. The attorney's fees issue. The attorney's fees, there is a Georgia provision that it follows the English rule. In other words, the prevailing party is not entitled to attorney's fees. The losing party is not obligated to attorney's fees. Rather, attorney's fees must be premised upon something. In this case, they were premised upon the contract. But this common law right, the contract for the remedy of attorney's fees, has been statutorily limited by the Georgia legislature. Under Georgia Statute 1311, like statutory tort of Mormon, that caps punitive damages or non-economic damages, the Georgia legislature has made a policy decision that a contract for attorney's fees, in any contract which evidences a debt, are limited by statute to no more than 15% of the amount recovered. And in fact, if a creditor attempts to get more than that by asking for reasonable attorney's fees, the legislature has said, you're capped at 10%. And it further has said that if you don't provide certain specific notice to the debtor, that you are entitled to no fees at all. This was a legislative mandate and a legislative decision that applies to all contracts which evidence debt. This contract clearly was a contract which evidenced a debt. Otherwise, on what basis did OFC Capital collect from A&T Publishing in this case? This was raised before the district court? It was, your honor. I want to address a couple of other points. Okay, let's be brief. We have lengthy briefs on these, so we don't need a rewatch. Just with respect to the warranty issues, OFC, or A&T Publishing, did bring an affirmative claim for a lease against the OFC Capital, which was as long as we can specify in the section 10 of the code, if a lessor makes certain representations regarding the equipment that's going to be tendered under the lease, that those give rise to express warranties, even if the word warranty is not used. And under Georgia case law, where the lessor uses the vendor's salespeople in negotiating the lease terms, the lessor can become liable for the representations of the vendor's salespeople in negotiating and procuring that lease. Those claims were claims that were properly fled, and the district court erroneously dismissed them. We do have your briefs. I assure you we do read the briefs. All right, thank you, counsel, for the argument. Very helpful. And we'll submit the case. We'll take up the final case on calendar today, which is State of Alaska v. Federal Subsistence Board. Thank you. Thank you.
judges: Nelson, Tashima, Fisher